**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY, and GEICO CASUALTY CO.,

                    Plaintiffs,

          -v-                                                    **Jury Trial Demand**

CHRIS LAVORIS THOMPSON, D.C., CHRIS
THOMPSON PA d/b/a HEALTH AND WELLNESS
CHIROPRACTIC CENTERS, MARK LAUDADIO, D.C.,
and SOUTH FLORIDA PHYSICAL MEDICINE &
REHABILITATION CENTER, LLC,

                    Defendants.

_____/

## COMPLAINT

       Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs"), as and for

their Complaint against Defendants Chris Lavoris Thompson, D.C. ("Thompson"), Chris

Thompson PA d/b/a Health and Wellness Chiropractic Centers ("Health and Wellness"), Mark

Laudadio, D.C. ("Laudadio"), and South Florida Physical Medicine & Rehabilitation Center, LLC

("South Florida Rehab")(collectively, the "Defendants"), hereby allege as follows:

       1.     This action seeks to recover more than $1,370,000.00 that the Defendants

wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault

("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Health

and Wellness and South Florida Rehab relating to medically unnecessary, illusory, unlawful, and

otherwise non-reimbursable health care services and goods, including putative initial

examinations, follow-up examinations, physical therapy, chiropractic, extracorporeal shockwave therapy ("ESWT"), home medical equipment ("HME"), and related services and goods (collectively, the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO PIP insurance policies ("Insureds").

2.      Additionally, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending and unpaid PIP claims that the Defendants submitted through Health and Wellness and South Florida Rehab, because of the fraudulent and unlawful activities described herein.

3.      As set forth herein, the Defendants were never entitled to receive payment on the PIP insurance claims that they submitted to GEICO, because:

(i)      at all relevant times, the Defendants operated in violation of Florida law, including: (a) the licensing and operating requirements set forth in Florida's Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the "Clinic Act"); (b) Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"); (c) Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011-486.172 (the "Physical Therapy Act"); (d) Florida's Patient Brokering Act, Fla. Stat. § 817.505 (the "Patient Brokering Act"); (e) Florida's Anti-Kickback Statute, Fla. Stat. § 456.054 (the "Anti-Kickback Statute"); and (f) Florida's Patient Self-Referral Act, Fla. Stat. § 456.053 (the "Self-Referral Act"), thereby rendering the Defendants ineligible to collect PIP insurance benefits in the first instance, and rendering the Defendants' PIP insurance charges noncompensable and unenforceable;

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services;

(iii)    in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)     the Defendants' billing for the Fraudulent Services misrepresented and exaggerated the nature, extent, and results of the Fraudulent Services, in order to fraudulently and unlawfully inflate the charges submitted to GEICO;

(v)     the Defendants unlawfully billed GEICO for "physical therapy" services that were provided by individuals who were both unlicensed and unsupervised; and

(vi)    the Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and the billing was submitted in violation of the requirements set forth in Florida's Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

4.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through Health and Wellness and South Florida Rehab to GEICO.

5.      Each charge submitted by the Defendants through Health and Wellness and South Florida Rehab since at least 2019 has been fraudulent and unlawful for the reasons set forth herein. The charts annexed hereto as Exhibits "1" - "2" set forth large and representative examples of the fraudulent and unlawful claims that have been identified to-date that the Defendants submitted to GEICO by mail through Health and Wellness and South Florida Rehab.

6.      The Defendants' interrelated fraudulent and unlawful scheme began no later than 2019 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $1,370,000.00.

## PARTIES

### I.     Plaintiffs

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and issue automobile insurance policies in Florida.

### II.    Defendants

8.      Defendant Thompson resides in and is a citizen of Florida. Thompson was licensed

to practice chiropractic in Florida on or about June 16, 2004, owned and controlled Health and Wellness and South Florida Rehab, and used Health and Wellness and South Florida Rehab as vehicles to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

9.     Defendant Health and Wellness is a Florida professional corporation with its principal place of business in Belle Glade, Florida, and is owned and controlled by Thompson. Health and Wellness was incorporated in Florida on or about October 18, 2004, and was used as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

10.     Defendant Laudadio resides in and is a citizen of Florida. Laudadio was licensed to practice chiropractic in Florida on or about May 19, 2008, owned and controlled South Florida Rehab, and used South Florida Rehab as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

11.     Defendant South Florida Rehab is a Florida limited liability company with its principal place of business in Belle Glade, Florida, and is owned and controlled by Thompson and Laudadio and has them as its members. South Florida Rehab was organized in Florida on or about May 1, 2018, and was used as a vehicle to submit fraudulent, unlawful, and non-reimbursable PIP billing to GEICO and other insurers.

**<u>JURISDICTION AND VENUE</u>**

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

13.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims

brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations (RICO) Act).

14.     Additionally, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

15.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside, and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

**I.     Overview of Pertinent Law Governing PIP Insurance Reimbursement**

16.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

17.     Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for their services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company using the required claim/billing forms – including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form") – in order to receive payment for medically necessary services.

18.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, health care services providers are only eligible to receive PIP Benefits for medically necessary services.

19.    Pursuant to the No-Fault Law, "medically necessary" means:

[A] medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a)    In accordance with generally accepted standards of medical practice;

(b)    Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c)    Not primarily for the convenience of the patient, physician, or other health care provider.

20.    PIP reimbursement for health care services is normally limited to $2,500.00 per insured. However, if a physician, physician assistant, advanced practice registered nurse, or dentist determines that an Insured suffered from an "emergency medical condition", health care providers can be reimbursed up to $10,000.00 per insured for health care services. Pursuant to the No-Fault Law, other types of health care practitioners – such as chiropractors – may not issue "emergency medical condition" diagnoses to patients so as to increase the potential PIP reimbursement from $2,500.00 to $10,000.00 per insured.

21.    Pursuant to the No-Fault Law, an "emergency medical condition" means: "a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) [s]erious jeopardy to patient health[;] (b) [s]erious impairment to bodily functions[; and/or] (c) [s]erious dysfunction of any bodily organ or part."

22.    In order for a health care service to be eligible for PIP reimbursement, it not only must be medically necessary, but also must be "lawfully" provided.

23.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state

and federal law related to the provision of medical services or treatment."

24.     Thus, health care services providers may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

25.     Pursuant to the Clinic Act, a license issued by the Florida Agency for Health Care Administration (the "AHCA") is required in order to operate a clinic in Florida. The Clinic Act defines "clinic" to mean: "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

26.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license. . . .

27.     Therefore, in order for a health care practice to qualify for the "wholly owned" exemption from the Clinic Act's clinic licensing requirements, the licensed health care practitioner who "wholly owns" the practice has a continuing obligation to supervise the business activities of the practice and remain legally responsible for the practice's compliance with all federal and state laws, and the practice cannot provide health care services that are beyond the scope of the supervising practitioner-owner's license.

28.     A health care practice that does not qualify for the "wholly owned" exemption, and

that does not otherwise have a clinic license, operates unlawfully under Florida law.

29.     Unless a health care practice is operating pursuant to an exemption from the clinic licensing requirements, it not only must obtain a clinic license, but must also "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic."

30.     Among other things, a clinic medical director must be a licensed physician, and must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

31.     In this context, a clinic medical director must also "[r]eview any patient referral contracts or agreements executed by the clinic."

32.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

33.     Further, a clinic medical director must "[s]erve as the clinic records owner as defined in [Fla. Stat. §] 456.057." Pursuant to Fla. Stat. § 456.057(10), "[a]ll records owners shall develop and implement policies, standards, and procedures to protect the confidentiality and security of the medical record," and all "[e]mployees of records owners shall be trained in these policies, standards, and procedures."

34.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether

the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes . . . an unlawful charge commits theft within the meaning of, and [which is] punishable as provided in, [Fla. Stat. §] 812.014."

35.     Thus, pursuant to both the No-Fault Law and the Clinic Act, health care practices that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

36.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving – or failing to make a good-faith effort to collect – co-payments or deductibles from patients with PIP insurance.

37.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

38.     Florida's Patient Brokering Act broadly prohibits any person from offering, paying, soliciting, or receiving any commission, bonus, rebate, kickback, or bribe – directly or indirectly, in cash or in kind – or from engaging in any fee-splitting arrangement of any type whatsoever, to either induce a patient referral or in exchange for a patient referral.

39.     Likewise, Florida's Anti-Kickback Statute prohibits any health care provider from offering, paying, soliciting, or receiving a kickback – directly or indirectly, overtly or covertly, in cash or in kind – for referring or soliciting patients. Violations of the Anti-Kickback Statute also constitute violations of the Patient Brokering Act.

40.     Further, subject to certain exceptions that are inapplicable in this case, Florida's Self-Referral Act prohibits chiropractors from self-referring patients for health care services to entities in which the referring chiropractors are investors or have an investment interest.

9

41.     The Self-Referral Act also provides that:

Any health care provider or other entity that enters into an arrangement or scheme, such as a cross-referral arrangement, which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity which, if the physician directly made referrals to such entity, would be in violation of this section, shall be subject to a civil penalty of not more than $100,000 for each such circumvention arrangement or scheme to be imposed and collected by the appropriate board.

42.     Pursuant to the Self-Referral Act, clinics and other health care providers may not submit any claim for payment to any insurer for services rendered pursuant to an unlawful self-referral.

43.     What is more, clinics and other health care providers that collect payments for services rendered pursuant to unlawful self-referrals must "refund such amount on a timely basis."

44.     Florida's Physical Therapy Act prohibits unlicensed individuals from practicing physical therapy. While the Physical Therapy Act does provide an exception to this rule – which permits a physical therapist to delegate certain patient care activities to an unlicensed assistant – this exception only applies if the unlicensed assistant works under the direct supervision of a physical therapist.

45.     Health care practices in Florida may not collect PIP Benefits for physical therapy services that are performed by unlicensed and unsupervised individuals.

46.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)      for any service or treatment that is "upcoded", meaning that the service or treatment is billed using a billing code that would result in payment greater in amount than would be paid by using a billing code that accurately describes the service or treatment performed;

(ii)     to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)    with respect to a bill or statement that does not substantially meet the billing

10

requirements as set forth in the No-Fault Law.

47.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare and Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes that are used to bill for health care services.

48.     In turn, the instructions promulgated by CMS for the completion of HCFA-1500 forms require, among other things, that all HCFA-1500 forms set forth – in Box 31 – the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

49.     To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

50.     Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials".

51.     Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

## II.     **The Defendants' Fraudulent and Unlawful Scheme**

52.     Since at least 2019 and continuing through the present, the Defendants conceived and implemented a fraudulent and unlawful scheme in which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

53.     In the claims identified in Exhibits "1" - "2", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor automobile accidents they experienced that would necessitate the treatments that the Defendants purported to provide.

54.     Even so, in the claims identified in Exhibits "1" - "2", the Defendants purported to subject almost every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that the Defendants could submit to insurers – including GEICO – rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to this "treatment".

55.     The Defendants provided their pre-determined and fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" - "2" without regard for the Insureds' individual symptoms or presentation – or, in most cases, the total absence of any serious continuing medical problems arising from any actual automobile accidents.

56.     Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, thereby permitting the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

57.     No legitimate physician, chiropractor, clinic, or health care provider would permit

the fraudulent and unlawful treatment and billing protocols designed herein to proceed under their auspices.

58.     The Defendants permitted the fraudulent and unlawful treatment and billing protocols described herein to proceed under their auspices because: (i) Health and Wellness and South Florida Rehab were, at all relevant times, operating in violation of the Clinic Act, without legitimate oversight by supervising practitioner-owners and without medical directors who legitimately fulfilled their statutory duties as medical directors; and (ii) the Defendants sought to profit from the fraudulent and unlawful billing that they submitted to GEICO and other insurers.

A.    **The Unlawful Operation of Health and Wellness and South Florida Rehab in Violation of the Clinic Act**

59.     Health and Wellness and South Florida Rehab purported to be exempt from the Clinic Act's health care clinic licensure requirements, but, in fact, operated without valid exemptions. As a result, both Health and Wellness and South Florida Rehab operated as unlicensed health care clinics in violation of the Clinic Act.

60.     Health and Wellness and South Florida Rehab were "clinics" within the meaning of the Clinic Act, in that each was an entity "where health care services [w]ere provided to individuals and which tender[ed] charges for reimbursement for such services."

61.     However, neither Health and Wellness nor South Florida Rehab had clinic licenses or medical directors.

62.     Instead, Health and Wellness was owned by Thompson, and South Florida Rehab was owned by Thompson and Laudadio, and both Health and Wellness and South Florida Rehab purported to operate under the "wholly owned" exemption from the Clinic Act's licensing, operating, and medical director requirements.

63.     However, Thompson never legitimately supervised the business activities of Health

and Wellness, inasmuch as Thompson never made any attempt to remedy the fraudulent and unlawful charges submitted through Health and Wellness, and he instead caused Health and Wellness to operate in the fraudulent and unlawful manner described herein.

64.     Had Thompson legitimately supervised the business activities of Health and Wellness, Thompson would not have permitted Health and Wellness to operate in the fraudulent and unlawful manner described herein.

65.     Moreover, Thompson could not have legitimately supervised Health and Wellness's business activities, inasmuch as Health and Wellness purported to provide medical services that were outside of the scope of Thompson's chiropractic license.

66.     Similarly, neither Thompson nor Laudadio legitimately supervised the business activities of South Florida Rehab, inasmuch as neither Thompson nor Laudadio made any attempt to remedy the fraudulent and unlawful charges submitted through South Florida Rehab, and instead caused South Florida Rehab to operate in the fraudulent and unlawful manner described herein.

67.     Had Thompson or Laudadio legitimately supervised the business activities of South Florida Rehab, they would not have permitted South Florida Rehab to operate in the fraudulent and unlawful manner described herein.

68.     What is more, neither Thompson nor Laudadio could have legitimately supervised South Florida Rehab's business activities, because South Florida Rehab purported to provide medical services that were outside of the scope of Thompson and Laudadio's chiropractic licenses.

69.     Accordingly, neither Health and Wellness nor South Florida Rehab ever qualified for the "wholly owned" exemption from licensure as a "health care clinic" that is set forth in the Clinic Act, or any other kind of valid exemption from the clinic licensing and medical director requirements. Additionally, neither Health and Wellness nor South Florida Rehab ever maintained

a clinic license, and neither Health and Wellness nor South Florida Rehab ever employed a licensed physician-medical director.

70.     As a result, both Health and Wellness and South Florida Rehab operated – at all relevant times – in violation of the licensing and operating requirements set forth in the Clinic Act.

**B.     The Defendants' Fraudulent and Unlawful Claims for Initial Examinations**

71.     As an initial step in the Defendants' fraudulent treatment and billing protocols, the Defendants purported to provide almost all of the Insureds in the claims identified in Exhibits "1" - "2" with an initial examination.

72.     As set forth in Exhibit "1", Health and Wellness and Thompson (collectively, the "Health and Wellness Defendants") billed the initial examinations to GEICO under CPT code 99203, typically resulting in a charge of $200.00 for each initial examination they purported to provide.

73.     As set forth in Exhibit "2", South Florida Rehab, Thompson, and Laudadio (collectively, the "South Florida Rehab Defendants") billed the initial examinations to GEICO under: (i) CPT code 99203, typically resulting in a charge of $900.00 for each initial examination they purported to provide; and (ii) CPT code 99204, typically resulting in a charge of $900.00 for each initial examination they purported to provide.

74.     In the claims for initial examinations identified in Exhibits "1" - "2", the charges for initial examinations were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

75.     In fact, and as set forth herein, the Defendants were never eligible to collect PIP Benefits, inasmuch as they operated in violation of Florida law.

76.     Moreover, and as set forth herein, the charges for initial examinations identified in

Exhibits "1" - "2" were also fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**1.  Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

77.  As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

78.  The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

79.  Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typically represents that the Insured presented with problems of moderate severity.

80.  The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination, including:

(i)  Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)  Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)  Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)  Initial office visit for evaluation of a 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)  Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

81.  Accordingly, pursuant to the CPT Assistant, the moderate severity presenting

problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

82.     Similarly, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the Insured presented with problems of moderate to high severity.

83.     The CPT Assistant provides the following clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination, including:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

84.     Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

85.     By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" -
"2" had any presenting problems at all as the result of their typically minor automobile accidents,
the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

86.     For instance, and in keeping with the fact that the Insureds in the claims identified
in Exhibits "1" - "2" typically either had no presenting problems at all as the result of their minor
automobile accidents, or else had problems of minimal severity, in the claims identified in Exhibits
"1" - "2", the Insureds typically did not seek treatment at any hospital as the result of their
accidents.

87.     To the limited extent that the Insureds in the claims identified in Exhibits "1" - "2"
did seek treatment at a hospital following their accidents, they almost always were briefly observed
on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue
injury diagnosis such as a sprain or strain.

88.     Furthermore, in most of the claims identified in Exhibits "1" - "2", the
contemporaneous police reports indicate that the Insureds' vehicles were functional following the
accidents, and that no one was seriously injured in their accidents – or injured at all.

89.     Even so, in the claims for initial examinations identified in Exhibits "1" - "2", the
Defendants routinely billed for their putative initial examinations using CPT codes 99203 and
99204, and thereby falsely represented that the Insureds presented with problems of moderate
severity and moderate to high severity, respectively.

90.     For example:

(i)     On January 25, 2019, an Insured named TB was involved in an automobile
        accident. The contemporaneous police report indicated that there was minor
        damage to TB's vehicle, that there was minor damage to the other vehicle, and that
        TB's vehicle was drivable following the accident. The police report further
        indicated that TB was not injured and that TB did not complain of any pain at the
        scene. In keeping with the fact that TB was not seriously injured, TB did not visit

any hospital emergency room following the accident. To the extent that TB experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of TB at Health and Wellness on February 14, 2019, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity. What is more, TB then presented to South Florida Rehab for an additional initial examination on February 15, 2019. The South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(ii)    On August 6, 2020, an Insured named DW was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to DW's vehicle, that there was minor damage to the other vehicle, and that DW's vehicle was drivable following the accident. The police report further indicated that DW was not injured and that DW did not complain of any pain at the scene. In keeping with the fact that DW was not seriously injured, DW did not visit any hospital emergency room following the accident. To the extent that DW experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of DW at Health and Wellness on August 11, 2020, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity. What is more, DW then presented to South Florida Rehab for an additional initial examination on August 21, 2020. The South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(iii)    On June 3, 2021, an Insured named HJ was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HJ's vehicle, that there was minor damage to the other vehicle, and that HJ's vehicle was drivable following the accident. The police report further indicated that HJ was not injured and that HJ did not complain of any pain at the scene. In keeping with the fact that HJ was not seriously injured, HJ did not visit any hospital emergency room following the accident. To the extent that HJ experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of HJ at Health and Wellness on June 7, 2021, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity. What is more, HJ then presented to South Florida Rehab for an additional initial examination on June 25, 2021. The South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(iv)     On October 19, 2021, an Insured named SW was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to SW's vehicle, that there was minor damage to the other vehicle, and that SW's vehicle was drivable following the accident. The police report further indicated that SW was not injured and that SW did not complain of any pain at the scene. In keeping with the fact that SW was not seriously injured, SW did not visit any hospital emergency room following the accident. To the extent that SW experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of SW at Health and Wellness on October 29, 2021, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity. What is more, SW then presented to South Florida Rehab for an additional initial examination on November 12, 2021. The South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved problems of moderate severity.

(v)     On September 8, 2022, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that LG was not injured and that LG did not complain of any pain at the scene. In keeping with the fact that LG was not seriously injured, LG did not visit any hospital emergency room following the accident. To the extent that LG experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of LG at South Florida Rehab on September 16, 2022, the South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi)     On October 17, 2022, an Insured named DS was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to DS's vehicle, that there was minor damage to the other vehicle, and that DS's vehicle was drivable following the accident. The police report further indicated that DS was not injured and that DS did not complain of any pain at the scene. In keeping with the fact that DS was not seriously injured, DS did not visit any hospital emergency room following the accident. To the extent that DS experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of DS at Health and Wellness on October 17, 2022, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)     On October 24, 2023, an Insured named VT was involved in an automobile accident. The contemporaneous police report indicated that VT was not injured and that VT did not complain of any pain at the scene. In keeping with the fact that VT

was not seriously injured, VT did not visit any hospital emergency room following the accident. To the extent that VT experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of VT at Health and Wellness on November 3, 2023, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(viii)    On November 30, 2023, an Insured named GR was involved in an automobile accident. The contemporaneous police report indicated that GR was not injured and that GR did not complain of any pain at the scene. In keeping with the fact that GR was not seriously injured, GR did not visit any hospital emergency room following the accident. To the extent that GR experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of GR at Health and Wellness on December 8, 2023, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity. What is more, GR then presented to South Florida Rehab for an additional initial examination on December 22, 2023. The South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(ix)    On August 7, 2024, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to CM's vehicle, that there was minor damage to the other vehicle, and that CM's vehicle was drivable following the accident. The police report further indicated that CM was not injured and that CM did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of CM at Health and Wellness on August 13, 2024, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity. What is more, CM then presented to South Florida Rehab for an additional initial examination on August 23, 2024. The South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

(x)    On January 17, 2025, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AA's vehicle, that there was minor damage to the other vehicle, and that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured and that AA did not complain of any pain at the

scene. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as the result of the accident, they were of minimal severity. Even so, following a purported initial examination of AA at Health and Wellness on January 21, 2025, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity. What is more, AA then presented to South Florida Rehab for an additional initial examination on January 31, 2025. The South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the initial examination involved problems of moderate to high severity.

91.     These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "2", the Defendants almost always falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity, when, in fact, the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents.

92.     In the claims for initial examinations identified in Exhibits "1" - "2", the Defendants almost always falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to create a false basis for their charges for examinations billed under CPT codes 99203 and 99204, because the Defendants were aware that examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

93.     In the claims for initial examinations identified in Exhibits "1" - "2", the Defendants also almost always falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations, physical therapy, chiropractic, ESWT, HME, and related

services and goods.

**2.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

94.      What is more, in every claim identified in Exhibits "1" - "2" for initial examinations billed under CPT codes 99203 and 99204, the Defendants misrepresented and exaggerated the amount of time that the examining practitioners spent performing the putative initial examinations.

95.      Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial examination represents that the physician or other practitioner who performed the examination spent at least 30 minutes of time performing the examination.

96.      When the Defendants billed GEICO for their purported initial examinations using CPT code 99203, they represented that the examining practitioners spent at least 30 minutes of time performing the examinations of the Insureds.

97.      Similarly, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination represents that the physician or other practitioner who performed the examination spent at least 45 minutes of time performing the examination.

98.      When the Defendants billed GEICO for their purported initial examinations using CPT code 99204, they represented that the examining practitioners spent at least 45 minutes of time performing the examinations of the Insureds.

99.      In fact, in the claims for initial examinations identified in Exhibits "1" - "2", the examining health care practitioners did not spend even 15 minutes of time performing the examinations of the Insureds – much less 30 or 45 minutes – to the extent that the examinations were actually conducted at all.

100.      In keeping with the fact that the initial examinations in the claims identified in Exhibits "1" - "2" did not require more than 15 minutes of time to perform, the examining

practitioners used templated forms in purporting to conduct the examinations.

101. All that was required to complete the templated forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs and a limited check of the Insureds' systems.

102. These interviews and examinations did not require any examining health care practitioner at Health and Wellness or South Florida Rehab to spend more than 15 minutes of time performing the putative initial examinations.

103. In the claims for initial examinations identified in Exhibits "1" - "2", the Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations of the Insureds, because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

**3.    Misrepresentations Regarding the Extent of Medical Decision-Making During the Initial Examinations**

104. Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination – namely: (i) straightforward medical decision-making; (ii) low complexity medical decision-making; (iii) moderate complexity medical decision-making; and (iv) high complexity medical decision-making.

105. Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or management options to be considered; (ii) the amount and/or complexity of the medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

106.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

107.    For an initial patient examination to legitimately entail "low complexity" medical decision-making, the examination typically must, among other things, involve: (i) the review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

108.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

109.    For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must, among other things, involve: (i) chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) the review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

110.    As set forth above and in Exhibits "1" - "2", the Defendants billed GEICO for almost all of their putative initial patient examinations of the Insureds using CPT codes 99203 and

99204, and thereby falsely represented that the examining practitioners engaged in genuine low complexity medical decision-making or genuine moderate complexity medical decision-making, respectively, in connection with the initial examinations.

111.    In fact, and to the extent that the Insureds in the claims identified in Exhibits "1" - "2" had any presenting problems at all as the result of their minor automobile accidents, the problems almost always were minor soft tissue injuries such as sprains and strains.

112.    The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate low complexity medical decision-making or any legitimate moderate complexity medical decision-making.

113.    First, in the Defendants' claims for initial examinations identified in Exhibits "1" - "2", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

114.    When the Insureds in the claims identified in Exhibits "1" - "2" presented to the Defendants for "treatment", they did not arrive with any significant medical records.

115.    Furthermore, prior to the initial examinations, the Defendants and their associates did not request any significant medical records from any other providers regarding the Insureds, nor did they provide, review, or analyze any complex diagnostic tests or other information in connection with the examinations.

116.    Second, in the Defendants' claims for initial examinations identified in Exhibits "1" - "2", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft tissue complaints.

117.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants during

the initial examinations.

118.    In almost all of the claims identified in Exhibits "1" - "2", any diagnostic procedures and treatment options that the Defendants recommended or provided during the initial examinations were limited to a series of medically unnecessary follow-up examinations, physical therapy, chiropractic, ESWT, HME, and related services and goods – none of which was health- or life-threatening if properly administered.

119.    Third, in the claims for initial examinations identified in Exhibits "1" - "2", the examining practitioners did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

120.    Rather, to the extent that the initial examinations were conducted in the first instance, the examining practitioners – at the direction of the Defendants – provided a substantially similar, pre-determined, and false series of soft tissue injury "diagnoses" for the Insureds, and prescribed a substantially similar course of medically unnecessary treatment for the Insureds.

121.    Specifically, in almost every instance in the claims identified in Exhibits "1" - "2", during the initial examinations, the Insureds did not report any serious continuing medical problems that legitimately could be traced to an underlying automobile accident.

122.    Even so, the examining practitioners – at the direction of the Defendants – prepared initial examination reports in which they provided false, boilerplate sprain/strain and similar soft tissue "diagnoses" to almost every Insured.

123.    Then, based upon these artificial "diagnoses", the examining practitioners – at the direction of the Defendants – in many cases falsely diagnosed almost every Insured in the claims identified in Exhibits "1" - "2" with a purported "emergency medical condition", and then directed the Insureds to undergo a series of medically unnecessary follow-up examinations, physical

therapy, chiropractic, ESWT, HME, and related services and goods.

124.     Contrary to the Defendants' false diagnoses, the Insureds in the claims identified in Exhibits "1" - "2" did not legitimately suffer from any significant health care problems at all as the result of their typically minor automobile accidents.

125.     For example:

(i)       On April 24, 2019, an Insured named EM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to EM's vehicle, that there was minor damage to the other vehicle, and that EM's vehicle was drivable following the accident. The police report further indicated that EM was not injured and that EM did not complain of any pain at the scene. In keeping with the fact that EM was not seriously injured, EM did not visit any hospital emergency room following the accident. To the extent that EM experienced any health problems at all as the result of the accident, they were of minimal severity. On April 26, 2019, EM purportedly received an initial examination at Health and Wellness. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Health and Wellness Defendants – provided EM with a false list of objectively unverifiable soft tissue injury "diagnoses". Neither EM's presenting problems nor the treatment plan provided to EM by the Health and Wellness Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, EM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Health and Wellness Defendants consisted of medically unnecessary Fraudulent Services, which did not pose any significant risk to EM. Even so, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(ii)      On February 2, 2020, an Insured named HY was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HY's vehicle, that there was minor damage to the other vehicle, and that HY's vehicle was drivable following the accident. The police report further indicated that HY was not injured and that HY did not complain of any pain at the scene. In keeping with the fact that HY was not seriously injured, HY did not visit any hospital emergency room following the accident. To the extent that HY experienced any health problems at all as the result of the accident, they were of minimal severity. On February 4, 2020, HY purportedly received an initial examination at Health and Wellness. To the extent that the examination was

performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Health and Wellness Defendants – provided HY with a false list of objectively unverifiable soft tissue injury "diagnoses". Neither HY's presenting problems nor the treatment plan provided to HY by the Health and Wellness Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, HY did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Health and Wellness Defendants consisted of medically unnecessary Fraudulent Services, which did not pose any significant risk to HY. Even so, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(iii)     On October 9, 2021, an Insured named RV was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to RV's vehicle, that there was minor damage to the other vehicle, and that RV's vehicle was drivable following the accident. The police report further indicated that RV was not injured and that RV did not complain of any pain at the scene. In keeping with the fact that RV was not seriously injured, RV did not visit any hospital emergency room following the accident. To the extent that RV experienced any health problems at all as the result of the accident, they were of minimal severity. On October 11, 2021, RV purportedly received an initial examination at Health and Wellness. What is more, RV then presented to South Florida Rehab for an additional initial examination on October 22, 2021. To the extent that the examinations were performed in the first instance, the examining practitioners did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examinations. Moreover, the examining practitioners did not consider any significant number of diagnoses or management options in connection with the examinations. Instead, the examining practitioners – at the direction of the Health and Wellness Defendants and the South Florida Rehab Defendants, respectively – provided RV with a false list of objectively unverifiable soft tissue injury "diagnoses". Neither RV's presenting problems nor the treatment plans provided to RV by the Health and Wellness Defendants and the South Florida Rehab Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, RV did not need any significant treatment at all as a result of the accident, and the treatment plans provided by the Health and Wellness Defendants and the South Florida Rehab Defendants consisted of medically unnecessary Fraudulent Services, which did not pose any significant risk to RV. Even so, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examinations entailed some legitimate, low complexity medical decision-making, and the South Florida Rehab Defendants billed GEICO

for the initial examination under CPT code 99204, and thereby falsely represented that the examinations entailed some legitimate, moderate complexity medical decision-making.

(iv)    On January 21, 2022, an Insured named NP was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to NP's vehicle, and that NP's vehicle was drivable following the accident. The police report further indicated that NP was not injured and that NP did not complain of any pain at the scene. In keeping with the fact that NP was not seriously injured, NP did not visit any hospital emergency room following the accident. To the extent that NP experienced any health problems at all as the result of the accident, they were of minimal severity. On January 26, 2022, NP purportedly received an initial examination at Health and Wellness. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Health and Wellness Defendants – provided NP with a false list of objectively unverifiable soft tissue injury "diagnoses". Neither NP's presenting problems nor the treatment plan provided to NP by the Health and Wellness Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, NP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Health and Wellness Defendants consisted of medically unnecessary Fraudulent Services, which did not pose any significant risk to NP. Even so, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(v)    On June 15, 2022, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that JC was not injured and that JC did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of minimal severity. On June 27, 2022, JC purportedly received an initial examination at Health and Wellness. What is more, JC then presented to South Florida Rehab for an additional initial examination on July 1, 2022. To the extent that the examinations were performed in the first instance, the examining practitioners did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examinations. Moreover, the examining practitioners did not consider any significant number of diagnoses or management options in connection with the examinations. Instead, the examining practitioners – at the direction of the Health and Wellness Defendants and the South Florida Rehab Defendants, respectively – provided JC with a false list of objectively unverifiable soft tissue injury

"diagnoses". Neither JC's presenting problems nor the treatment plans provided to JC by the Health and Wellness Defendants and the South Florida Rehab Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, JC did not need any significant treatment at all as a result of the accident, and the treatment plans provided by the Health and Wellness Defendants and the South Florida Rehab Defendants consisted of medically unnecessary Fraudulent Services, which did not pose any significant risk to JC. Even so, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examinations entailed some legitimate, low complexity medical decision-making, and the South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examinations entailed some legitimate, moderate complexity medical decision-making.

(vi) On October 17, 2022, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AS's vehicle, and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and that AS did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of minimal severity. On October 21, 2022, AS purportedly received an initial examination at Health and Wellness. To the extent that the examination was performed in the first instance, the examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of the Health and Wellness Defendants – provided AS with a false list of objectively unverifiable soft tissue injury "diagnoses". Neither AS's presenting problems nor the treatment plan provided to AS by the Health and Wellness Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, AS did not need any significant treatment at all as a result of the accident, and the treatment plan provided by the Health and Wellness Defendants consisted of medically unnecessary Fraudulent Services, which did not pose any significant risk to AS. Even so, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making.

(vii) On November 9, 2022, an Insured named GC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to GC's vehicle, and that GC's vehicle was drivable following the accident. The police report further indicated that GC was not injured and that GC did not complain of any pain at the scene. In keeping with the fact that GC was not seriously injured, GC did not visit any hospital emergency room following the accident. To

the extent that GC experienced any health problems at all as the result of the accident, they were of minimal severity. On November 21, 2022, GC purportedly received an initial examination at Health and Wellness. What is more, GC then presented to South Florida Rehab for an additional initial examination on December 9, 2022. To the extent that the examinations were performed in the first instance, the examining practitioners did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examinations. Moreover, the examining practitioners did not consider any significant number of diagnoses or management options in connection with the examinations. Instead, the examining practitioners – at the direction of the Health and Wellness Defendants and the South Florida Rehab Defendants, respectively – provided GC with a false list of objectively unverifiable soft tissue injury "diagnoses". Neither GC's presenting problems nor the treatment plans provided to GC by the Health and Wellness Defendants and the South Florida Rehab Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, GC did not need any significant treatment at all as a result of the accident, and the treatment plans provided by the Health and Wellness Defendants and the South Florida Rehab Defendants consisted of medically unnecessary Fraudulent Services, which did not pose any significant risk to GC. Even so, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making, and the South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(viii)   On November 20, 2023, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JR's vehicle, that there was minor damage to the other vehicle, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and that JR did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as the result of the accident, they were of minimal severity. On November 27, 2023, JR purportedly received an initial examination at Health and Wellness. What is more, JR then presented to South Florida Rehab for an additional initial examination on December 1, 2023. To the extent that the examinations were performed in the first instance, the examining practitioners did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examinations. Moreover, the examining practitioners did not consider any significant number of diagnoses or management options in connection with the examinations. Instead, the examining practitioners – at the direction of the Health and Wellness Defendants and the South Florida Rehab Defendants, respectively – provided JR with a false list of objectively unverifiable soft tissue injury "diagnoses". Neither JR's presenting problems nor the treatment plans provided to JR by the Health and

Wellness Defendants and the South Florida Rehab Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, JR did not need any significant treatment at all as a result of the accident, and the treatment plans provided by the Health and Wellness Defendants and the South Florida Rehab Defendants consisted of medically unnecessary Fraudulent Services, which did not pose any significant risk to JR. Even so, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making, and the South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(ix)     On December 5, 2023, an Insured named WR was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to WR's vehicle, that there was minor damage to the other vehicle, and that WR's vehicle was drivable following the accident. The police report further indicated that WR was not injured and that WR did not complain of any pain at the scene. In keeping with the fact that WR was not seriously injured, WR did not visit any hospital emergency room following the accident. To the extent that WR experienced any health problems at all as the result of the accident, they were of minimal severity. On December 11, 2023, WR purportedly received an initial examination at Health and Wellness. What is more, WR then presented to South Florida Rehab for an additional initial examination on December 22, 2023. To the extent that the examinations were performed in the first instance, the examining practitioners did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examinations. Moreover, the examining practitioners did not consider any significant number of diagnoses or management options in connection with the examinations. Instead, the examining practitioners – at the direction of the Health and Wellness Defendants and the South Florida Rehab Defendants, respectively – provided WR with a false list of objectively unverifiable soft tissue injury "diagnoses". Neither WR's presenting problems nor the treatment plans provided to WR by the Health and Wellness Defendants and the South Florida Rehab Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, WR did not need any significant treatment at all as a result of the accident, and the treatment plans provided by the Health and Wellness Defendants and the South Florida Rehab Defendants consisted of medically unnecessary Fraudulent Services, which did not pose any significant risk to WR. Even so, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making, and the South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

(x)     On December 1, 2024, an Insured named CJ was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to CJ's vehicle, and that CJ's vehicle was drivable following the accident. The police report further indicated that CJ was not injured and that CJ did not complain of any pain at the scene. In keeping with the fact that CJ was not seriously injured, CJ did not visit any hospital emergency room following the accident. To the extent that CJ experienced any health problems at all as the result of the accident, they were of minimal severity. On December 3, 2024, CJ purportedly received an initial examination at Health and Wellness. What is more, CJ then presented to South Florida Rehab for an additional initial examination on January 31, 2025. To the extent that the examinations were performed in the first instance, the examining practitioners did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examinations. Moreover, the examining practitioners did not consider any significant number of diagnoses or management options in connection with the examinations. Instead, the examining practitioners – at the direction of the Health and Wellness Defendants and the South Florida Rehab Defendants, respectively – provided CJ with a false list of objectively unverifiable soft tissue injury "diagnoses". Neither CJ's presenting problems nor the treatment plans provided to CJ by the Health and Wellness Defendants and the South Florida Rehab Defendants presented any risk of significant complications, morbidity, or mortality. On the contrary, CJ did not need any significant treatment at all as a result of the accident, and the treatment plans provided by the Health and Wellness Defendants and the South Florida Rehab Defendants consisted of medically unnecessary Fraudulent Services, which did not pose any significant risk to CJ. Even so, the Health and Wellness Defendants billed GEICO for the initial examination under CPT code 99203, and thereby falsely represented that the examination entailed some legitimate, low complexity medical decision-making, and the South Florida Rehab Defendants billed GEICO for the initial examination under CPT code 99204, and thereby falsely represented that the examination entailed some legitimate, moderate complexity medical decision-making.

126.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "2", the Defendants routinely and falsely represented that the examinations involved legitimate low complexity medical decision-making and legitimate moderate complexity medical decision-making, when, in fact, they did not.

127.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

128.    An individual's age, height, weight, general physical condition, location within the

vehicle, and location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

129.    As set forth above, in the claims identified in Exhibits "1" - "2", almost all of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents.

130.    It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" - "2" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

131.    It is even more improbable – to the point of impossibility – that this kind of pattern would recur with great frequency within the cohort of patients treating at Health and Wellness and South Florida Rehab, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms warranting substantially similar diagnoses and treatment.

132.    Even so, in keeping with the fact that the Defendants' putative "diagnoses" were pre-determined and false, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, the examining practitioners at Health and Wellness and South Florida Rehab – at the direction of the Defendants – frequently issued substantially similar, false "diagnoses", on or around the same date, to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary treatment to the Insureds, despite the fact that each of the Insureds was differently situated and in any case did not legitimately require the "treatment".

133.    For example:

(i)    On March 31, 2019, three Insureds – CS, JS, and TS – were involved in the same automobile accident. Thereafter, all three Insureds presented at Health and Wellness for initial examinations on or around same date, with CS and JS presenting at Health and Wellness on April 5, 2019, and TS presenting at Health

and Wellness on April 8, 2019. Then, all three Insureds also presented at South Florida Rehab for initial examinations on the exact same date, April 12, 2019. CS, JS, and TS: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that CS, JS, and TS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided CS, JS, and TS with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(ii)     On October 19, 2019, three Insureds – LG, AR, and AR – were involved in the same automobile accident. Thereafter, all three Insureds presented at Health and Wellness for initial examinations on the exact same date, December 11, 2019. LG, AR, and AR: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that LG, AR, and AR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants provided LG, AR, and AR with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(iii)    On November 8, 2019, two Insureds – JL and SL – were involved in the same automobile accident. Thereafter, both Insureds presented at Health and Wellness for initial examinations on the exact same date, November 13, 2019. JL and SL: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that JL and SL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants provided JL and SL with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(iv)     On January 19, 2020, two Insureds – CJ and MJ – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Health and Wellness for initial examinations on the exact same date, January 27, 2020. Even more incredibly, both Insureds then presented at South Florida Rehab for initial examinations on the exact same date, January 31, 2020. CJ and MJ: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that CJ and MJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided CJ and MJ with substantially similar, false soft

tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(v)     On February 22, 2020, three Insureds – LF, TO, and JW – were involved in the same automobile accident. Thereafter, all three Insureds presented at Health and Wellness for initial examinations on the exact same date, March 26, 2020. Then, all three Insureds presented at South Florida Rehab for initial examinations on the exact same date, March 27, 2020. LF, TO, and JW: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that LF, TO, and JW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided LF, TO, and JW with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(vi)    On July 16, 2020, three Insureds – EM, MP, and CW – were involved in the same automobile accident. Thereafter, all three Insureds presented at Health and Wellness for initial examinations on the exact same date, July 28, 2020. Then, EM and CW presented at South Florida Rehab for initial examinations on the exact same date, February 26, 2021. EM, MP, and CW: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that EM, MP, and CW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided EM, MP, and CW with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(vii)   On November 17, 2020, two Insureds – BJ and EJ – were involved in the same automobile accident. Thereafter, both Insureds presented at Health and Wellness for initial examinations on the exact same date, November 19, 2020. BJ and EJ: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that BJ and EJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants provided BJ and EJ with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(viii)  On May 23, 2021, two Insureds – AA and AB – were involved in the same automobile accident. Thereafter, both Insureds presented at Health and Wellness on consecutive dates, May 27, 2021, and May 28, 2021. Then, both Insureds

presented at South Florida Rehab for initial examinations on the exact same date, June 11, 2021. AA and AB: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that AA and AB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided AA and AB with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(ix)    On July 17, 2021, four Insureds – CB, LC, MC, and CT – were involved in the same automobile accident. Thereafter, all four Insureds presented at Health and Wellness for initial examinations on the exact same date, August 5, 2021. CB, LC, MC, and CT: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that CB, LC, MC, and CT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants provided CB, LC, MC, and CT with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all four of them.

(x)    On December 7, 2021, three Insureds – LG, AH, and EJ – were involved in the same automobile accident. Thereafter, all three Insureds presented at Health and Wellness for initial examinations on the exact same date, December 29, 2021. LG, AH, and EJ: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that LG, AH, and EJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants provided LG, AH, and EJ with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xi)    On March 15, 2022, three Insureds – AM, LM, TM – were involved in the same automobile accident. Thereafter, all three Insureds presented at Health and Wellness for initial examinations on the exact same date, March 28, 2022. Then, AM and TM presented at South Florida Rehab for initial examinations on the exact same date, April 1, 2022. AM, LM, and TM: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that AM, LM, and TM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided AM, LM, and TM with substantially similar, false soft tissue injury "diagnoses"

38

and recommended a substantially similar course of medically unnecessary treatment to all three of them.

(xii)  On October 30, 2022, two Insureds – LC and JL – were involved in the same automobile accident. Thereafter, both Insureds presented at Health and Wellness for initial examinations on the exact same date, October 31, 2022. Then, both Insureds presented at South Florida Rehab for initial examinations on the exact same date, November 18, 2022. LC and JL: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that LC and JL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided LC and JL with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiii)  On November 30, 2022, two Insureds – AV and GV – were involved in the same automobile accident. Thereafter, both Insureds presented at Health and Wellness for initial examinations on the exact same date, December 2, 2022. AV and GV: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that AV and GV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants provided AV and GV with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xiv)  On April 19, 2023, two Insureds – CB and KS – were involved in the same automobile accident. Thereafter, both Insureds presented at Health and Wellness for initial examinations on the exact same date, April 28, 2023. CB and KS: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that CB and KS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants provided CB and KS with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xv)  On July 14, 2023, two Insureds – JY and KY – were involved in the same automobile accident. Thereafter, both Insureds presented at Health and Wellness for initial examinations on the exact same date, July 21, 2023. Then, both Insureds presented at South Florida Rehab for initial examinations on the exact same date, August 18, 2023. JY and KY: (a) were different ages; (b) were in different physical

conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that JY and KY suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided JY and KY with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xvi)   On July 24, 2023, two Insureds – NL and MR – were involved in the same automobile accident. Thereafter, both Insureds presented at Health and Wellness for initial examinations on the exact same date, August 1, 2023. Then, both Insureds presented at South Florida Rehab for initial examinations on the exact same date, August 4, 2023. NL and MR: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that NL and MR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided NL and MR with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xvii)  On November 4, 2023, four Insureds – OC, CG, CG, and JG – were involved in the same automobile accident. Thereafter, all four Insureds presented at Health and Wellness for initial examinations on the exact same date, November 15, 2023. Then, all four Insureds presented at South Florida Rehab for initial examinations on the exact same date, December 1, 2023. OC, CG, CG, and JG: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that OC, CG, CG, and JG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided OC, CG, CG, and JG with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to all four of them.

(xviii) On March 27, 2024, two Insureds – JG and PR – were involved in the same automobile accident. Thereafter, both Insureds presented at Health and Wellness for initial examinations on the exact same date, April 1, 2024. Then, both Insureds presented at South Florida Rehab for initial examinations on the exact same date, April 5, 2024. JG and PR: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that JG and PR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants and the South Florida Rehab Defendants provided JG and PR

with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xix)   On August 7, 2024, two Insureds – AM and CM – were involved in the same automobile accident. Thereafter, both Insureds presented at Health and Wellness for initial examinations on the exact same date, August 13, 2024. AM and CM: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that AM and CM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the Health and Wellness Defendants provided AM and CM with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

(xx)   On August 30, 2024, two Insureds – MJ and CP – were involved in the same automobile accident. Thereafter, both Insureds presented at South Florida Rehab for initial examinations on the exact same date, September 13, 2024. MJ and CP: (a) were different ages; (b) were in different physical conditions; (c) were located in different positions in the vehicle; and (d) experienced the impact from different positions in the vehicle. To the extent that MJ and CP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, the South Florida Rehab Defendants provided MJ and CP with substantially similar, false soft tissue injury "diagnoses" and recommended a substantially similar course of medically unnecessary treatment to both of them.

134.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "2", the Defendants frequently issued substantially similar "diagnoses" – on or around the same date – to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that each of the Insureds was differently situated and, in any case, did not require the treatment.

135.    The Defendants routinely caused these false "diagnoses" to be inserted into their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

136.    In the claims for initial examinations identified in Exhibits "1" - "2", the Defendants routinely and falsely represented that the putative initial examinations involved legitimate low complexity medical decision-making and legitimate moderate complexity medical decision-making, in order to create a false basis to bill for the initial examinations under CPT codes 99203 and 99204. This is because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

137.    In this context, Thompson, who – at all relevant times – purported to own Health and Wellness, did not legitimately supervise the business activities of Health and Wellness.

138.    Had Thompson legitimately supervised the business activities of Health and Wellness, he would have taken action to address the fact that – among other things – Health and Wellness's billings routinely and falsely misrepresented the nature, extent, and results of the purported initial examinations at Health and Wellness.

139.    In this context, Thompson and Laudadio, who – at all relevant times – purported to own South Florida Rehab, did not legitimately supervise the business activities of South Florida Rehab.

140.    Had Thompson and Laudadio legitimately supervised the business activities of South Florida Rehab, they would have taken action to address the fact that – among other things – South Florida Rehab's billings routinely and falsely misrepresented the nature, extent, and results of the purported initial examinations at South Florida Rehab.

141.    In the claims for initial examinations identified in Exhibits "1" - "2", the Defendants routinely and fraudulently misrepresented that the initial examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, the initial examinations were neither

lawfully provided nor reimbursable, because:

(i)    the putative initial examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)   the charges for the putative initial examinations misrepresented the nature, extent, and results of the examinations; and

(iii)  neither Health and Wellness nor South Florida Rehab was ever eligible to collect PIP Benefits in connection with the putative initial examinations in the first instance, inasmuch as both Health and Wellness and South Florida Rehab operated in violation of Florida law.

**C.    The Defendants' Fraudulent and Unlawful Claims for Follow-Up Examinations**

142.    In addition to their fraudulent initial examinations, the Defendants also purported to subject many of the Insureds in the claims identified in Exhibits "1" - "2" to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocols.

143.    As set forth in Exhibit "1", the Health and Wellness Defendants billed the follow-up examinations to GEICO under: (i) CPT code 99213, typically resulting in a charge of $106.00 for each follow-up examination they purported to provide; and (ii) CPT code 99214, typically resulting in a charge of $250.00 or $750.00 for each follow-up examination they purported to provide.

144.    As set forth in Exhibit "2", the South Florida Rehab Defendants billed the follow-up examinations to GEICO under CPT code 99214, typically resulting in a charge of $750.00 for each follow-up examination they purported to provide.

145.    In the claims for follow-up examinations identified in Exhibits "1" - "2", the charges for follow-up examinations were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

146.    In fact, and as set forth herein, the Defendants were never eligible to collect PIP

Benefits, inasmuch as both Health and Wellness and South Florida Rehab operated in violation of Florida law.

147.     As set forth below, the charges for the follow-up examinations identified in Exhibits "1" - "2" were also fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

**1.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

148.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up patient examination typically represents that the Insured presented with problems of low to moderate severity.

149.     The CPT Assistant provides various clinical examples of low to moderate severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination, including:

(i)      Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)     Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)      Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)     Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

150.     Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

151.     Similarly, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up patient examination represents that the Insured presented with problems of moderate to high severity.

152.     The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination, including:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 38-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)     Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)     Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)     Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)     Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)     Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

153.     Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

154.     By contrast, and as set forth herein, to the extent that the Insureds in the claims identified in Exhibits "1" - "2" suffered any injuries at all as the result of their typically minor accidents, the injuries were minor soft tissue injuries – such as sprains and strains – which were not severe at all.

155.     Ordinary soft tissue injuries such as sprains and strains almost always resolve after a short course of conservative treatment such as rest, ice, compression, and/or elevation – or no treatment at all.

156.     By the time the Insureds in the claims identified in Exhibits "1" - "2" presented at Health and Wellness and South Florida Rehab for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their typically minor automobile accidents, or their problems were minimal.

157.     Even so, in the claims for follow-up examinations identified in Exhibits "1" - "2", the Defendants routinely billed GEICO for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate severity or moderate to high severity, respectively, at the time of the purported follow-up examinations.

158.     For example:

(i)      On October 25, 2019, an Insured named HJ was involved in an automobile accident. The contemporaneous police report indicated that HJ was not injured and that HJ did not complain of any pain at the scene. In keeping with the fact that HJ was not seriously injured, HJ did not visit any hospital emergency room following the

46

accident. To the extent that HJ experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following seven purported follow-up examinations of HJ at Health and Wellness and South Florida Rehab on October 30, 2019 (Health and Wellness), November 15, 2019 (Health and Wellness), November 22, 2019 (South Florida Rehab), December 6, 2019 (South Florida Rehab), December 9, 2019 (Health and Wellness), December 20, 2019 (South Florida Rehab), and January 17, 2020 (Health and Wellness), the Health and Wellness Defendants and the South Florida Rehab Defendants billed GEICO for the follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the follow-up examinations involved presenting problems of low to moderate severity and moderate to high severity, respectively.

(ii)     On January 26, 2020, an Insured named DC was involved in an automobile accident. The contemporaneous police report indicated that DC was not injured and that DC did not complain of any pain at the scene. In keeping with the fact that DC was not seriously injured, DC did not visit any hospital emergency room following the accident. To the extent that DC experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following two purported follow-up examinations of DC at Health and Wellness on January 28, 2020, and February 27, 2020, the Health and Wellness Defendants billed GEICO for the follow-up examinations under CPT code 99213, and thereby falsely represented that the follow-up examinations involved presenting problems of low to moderate severity.

(iii)    On February 2, 2020, an Insured named HY was involved in an automobile accident. The contemporaneous police report indicated that HY was not injured and that HY did not complain of any pain at the scene. In keeping with the fact that HY was not seriously injured, HY did not visit any hospital emergency room following the accident. To the extent that HY experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following six purported follow-up examinations of HY at Health and Wellness on February 6, 2020, February 27, 2020, March 21, 2020, April 11, 2020, May 5, 2020, and June 4, 2020, the Health and Wellness Defendants billed GEICO for the follow-up examinations under CPT code 99213, and thereby falsely represented that the follow-up examinations involved presenting problems of low to moderate severity.

(iv)    On January 20, 2021, an Insured named DP was involved in an automobile accident. The contemporaneous police report indicated that DP was not injured and that DP did not complain of any pain at the scene. In keeping with the fact that DP was not seriously injured, DP did not visit any hospital emergency room following the accident. To the extent that DP experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following three

purported follow-up examinations of DP at Health and Wellness and South Florida Rehab on January 25, 2021 (Health and Wellness), February 17, 2021 (Health and Wellness), and March 5, 2021 (South Florida Rehab), the Health and Wellness Defendants and the South Florida Rehab Defendants billed GEICO for the follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the follow-up examinations involved presenting problems of low to moderate severity and moderate to high severity, respectively.

(v)     On April 11, 2022, an Insured named FS was involved in an automobile accident. The contemporaneous police report indicated that FS was not injured and that FS did not complain of any pain at the scene. In keeping with the fact that FS was not seriously injured, FS did not visit any hospital emergency room following the accident. To the extent that FS experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following four purported follow-up examinations of FS at Health and Wellness on April 15, 2022, May 16, 2022, June 22, 2022, and July 19, 2022, the Health and Wellness Defendants billed GEICO for the follow-up examinations under CPT code 99213, and thereby falsely represented that the follow-up examinations involved presenting problems of low to moderate severity.

(vi)    On June 15, 2022, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that JC was not injured and that JC did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following ten purported follow-up examinations of JC at Health and Wellness and South Florida Rehab on June 29, 2022 (Health and Wellness), July 18, 2022 (Health and Wellness), July 29, 2022 (South Florida Rehab), August 4, 2022 (Health and Wellness), August 12, 2022 (South Florida Rehab), August 26, 2022 (Health and Wellness), September 9, 2022 (South Florida Rehab), October 6, 2022 (Health and Wellness), October 14, 2022 (South Florida Rehab), and November 29, 2022 (Health and Wellness), the Health and Wellness Defendants and the South Florida Rehab Defendants billed GEICO for the follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the follow-up examinations involved presenting problems of low to moderate severity and moderate to high severity, respectively.

(vii)   On December 21, 2022, an Insured named CM was involved in an automobile accident. The contemporaneous police report indicated that CM was not injured and that CM did not complain of any pain at the scene. In keeping with the fact that CM was not seriously injured, CM did not visit any hospital emergency room following the accident. To the extent that CM experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following six

purported follow-up examinations of CM at Health and Wellness and South Florida Rehab on February 6, 2023 (Health and Wellness), February 23, 2023 (Health and Wellness), February 24, 2023 (South Florida Rehab), March 17, 2023 (Health and Wellness), April 7, 2023 (Health and Wellness), and June 1, 2023 (Health and Wellness), the Health and Wellness Defendants and the South Florida Rehab Defendants billed GEICO for the follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the follow-up examinations involved presenting problems of low to moderate severity and moderate to high severity, respectively.

(viii)   On October 2, 2023, an Insured named CK was involved in an automobile accident. The contemporaneous police report indicated that CK was not injured and that CK did not complain of any pain at the scene. In keeping with the fact that CK was not seriously injured, CK did not visit any hospital emergency room following the accident. To the extent that CK experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of CK at Health and Wellness on December 4, 2023, the Health and Wellness Defendants billed GEICO for the follow-up examination under CPT code 99213, and thereby falsely represented that the follow-up examination involved presenting problems of low to moderate severity.

(ix)    On June 12, 2024, an Insured named GB was involved in an automobile accident. The contemporaneous police report indicated that GB was not injured and that GB did not complain of any pain at the scene. In keeping with the fact that GB was not seriously injured, GB did not visit any hospital emergency room following the accident. To the extent that GB experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following three purported follow-up examinations of GB at Health and Wellness on June 27, 2024, July 17, 2024, and August 26, 2024, the Health and Wellness Defendants billed GEICO for the follow-up examinations under CPT code 99213, and thereby falsely represented that the follow-up examinations involved presenting problems of low to moderate severity.

(x)     On January 17, 2025, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that AA was not injured and that AA did not complain of any pain at the scene. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following six purported follow-up examinations of AA at Health and Wellness and South Florida Rehab on January 23, 2025 (Health and Wellness), February 10, 2025 (Health and Wellness), February 27, 2025 (Health and Wellness), March 14, 2025 (South Florida Rehab), March 24, 2025 (Health and Wellness), and April 29, 2025 (Health

and Wellness), the Health and Wellness Defendants and the South Florida Rehab Defendants billed GEICO for the follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the follow-up examinations involved presenting problems of low to moderate severity and moderate to high severity, respectively.

159.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" - "2", the Defendants routinely and falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity, when, in fact, the Insureds either did not have any genuine presenting problems at all as the result of their typically minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

160.    In the claims for follow-up examinations identified in Exhibits "1" - "2", the Defendants almost always falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations billed under CPT codes 99213 and 99214, because examinations billed under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

2.    **Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

161.    What is more, in the claims for follow-up examinations identified in Exhibits "1" - "2", no health care practitioner associated with Health and Wellness or South Florida Rehab took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

162.    Rather, following the purported follow-up examinations at Health and Wellness and South Florida Rehab, the examining practitioners – at the direction of the Defendants – simply:

(i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and (ii) either: (a) referred the Insureds for even more medically unnecessary Fraudulent Services, despite the fact that the Insureds purportedly had already received extensive Fraudulent Services that supposedly had not been successful in resolving their purported pain symptoms; or (b) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

163.    The putative "follow-up examinations" that the Defendants purported to provide the Insureds in the claims identified in Exhibits "1" - "2" were, therefore, medically useless, and played no legitimate role in the treatment or care of the Insureds. This is because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plans that were pre-determined for each Insured from the moment that they presented at Health and Wellness and South Florida Rehab's offices.

164.    In this context, Thompson, who – at all relevant times – purported to own Health and Wellness, did not legitimately supervise the business activities of Health and Wellness.

165.    Had Thompson legitimately supervised the business activities of Health and Wellness, he would have taken action to address the fact that – among other things – Health and Wellness's billings routinely and falsely misrepresented the nature, extent, and results of the purported follow-up examinations at Health and Wellness.

166.    In this context, Thompson and Laudadio, who – at all relevant times – purported to own South Florida Rehab, did not legitimately supervise the business activities of South Florida Rehab.

167.    Had Thompson and Laudadio legitimately supervised the business activities of South Florida Rehab, they would have taken action to address the fact that – among other things – South Florida Rehab's billings routinely and falsely misrepresented the nature, extent, and results

of the purported follow-up examinations at South Florida Rehab.

168.     In the claims for follow-up examinations identified in Exhibits "1" - "2", the

Defendants routinely and falsely misrepresented that the follow-up examinations were lawfully

provided and eligible for PIP reimbursement, when, in fact, the follow-up examinations were

neither lawfully provided nor reimbursable, because:

      (i)      the putative follow-up examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

      (ii)     the charges for the putative follow-up examinations misrepresented the nature, extent, and results of the examinations; and

      (iii)   Health and Wellness and South Florida Rehab were never eligible to collect PIP Benefits in connection with the putative follow-up examinations in the first instance, inasmuch as Health and Wellness and South Florida Rehab operated in violation of Florida law.

**D.     The Unlawful Operation of Health and Wellness and South Florida Rehab in Violation of the Patient Brokering Act, the Anti-Kickback Statute, and the Self-Referral Act**

169.     The Defendants' scheme was aimed at generating as much PIP billing as possible,

per Insured, which in turn required them to provide large amounts of medically unnecessary

Fraudulent Services to each Insured, regardless of whether the Insureds needed the Fraudulent

Services.

170.     However, the Defendants knew that, if they billed for all of their Fraudulent

Services through a single entity or practice, under a single tax identification number, it could draw

attention to their fraudulent and unlawful PIP billing scheme.

171.     Accordingly, the Defendants caused Health and Wellness and South Florida Rehab

to be formed as separate entities, with different names and tax identification numbers, and then

divided their billing for the Fraudulent Services across the two separate entities, in order to reduce

the volume of Fraudulent Services billed through any one entity, and thereby conceal and perpetuate their fraudulent PIP billing scheme.

172.    To facilitate their scheme, the Defendants engaged in patterns of unlawful patient brokering and self-referrals between and among Health and Wellness and South Florida Rehab.

173.    In particular:

(i)     Thompson – who owned both Health and Wellness and South Florida Rehab – routinely and unlawfully paid health care practitioners at Health and Wellness to self-refer Insureds from Health and Wellness to South Florida Rehab for medically unnecessary examinations, which then were billed through South Florida Rehab to GEICO; and

(ii)    At the conclusion of the Insureds' purported examinations at South Florida Rehab, Laudadio and Thompson routinely and unlawfully paid health care practitioners at South Florida Rehab to falsely diagnose the Insureds with "emergency medical conditions" – thereby increasing the amount of PIP reimbursement that the Defendants could obtain for each Insured from $2,500.00 to $10,000.00 – and to cross-refer the Insureds back to Health and Wellness for even more medically unnecessary Fraudulent Services, which then were billed through Health and Wellness to GEICO.

174.    Virtually all of the Insureds in the claims identified in Exhibit "2" who purportedly received treatment at South Florida Rehab were referred from Health and Wellness to South Florida Rehab pursuant to this scheme, which violated not only the Self-Referral Act (because Thompson, who was a "health care provider" under the Self-Referral Act, orchestrated the referrals between and among two practices he owned), but also the Patient Brokering Act and Anti-Kickback Statute (because Thompson and Laudadio required treating practitioners to refer Insureds from Health and Wellness to South Florida Rehab, and vice-versa, as a condition of their employment).

175.    In reality, these were "pay-to-play" arrangements that caused the Health and Wellness Defendants and the South Florida Rehab Defendants to make and receive medically unnecessary patient referrals in violation of the Patient Brokering Act, the Anti-Kickback Statute,

and the Self-Referral Act.

176.    In the claims identified in Exhibits "1" - "2", the Health and Wellness Defendants and the South Florida Rehab Defendants routinely and falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, the services were neither lawfully provided nor reimbursable, because the services were provided – to the extent that they were provided at all – pursuant to an illegal patient brokering, kickback, and self-referral scheme.

177.    In this context, Thompson, who – at all relevant times – purported to own Health and Wellness, did not legitimately supervise the business activities of Health and Wellness.

178.    Had Thompson legitimately supervised the business activities of Health and Wellness, Thompson would not have permitted Health and Wellness to operate in the fraudulent and unlawful manner described herein.

179.    Moreover, Thompson and Laudadio, who – at all relevant times – purported to own South Florida Rehab, did not legitimately supervise the business activities of South Florida Rehab.

180.    Had Thompson and Laudadio legitimately supervised the business activities of South Florida Rehab, Thompson and Laudadio would not have permitted South Florida Rehab to operate in the fraudulent and unlawful manner described herein.

**E.    The Health and Wellness Defendants' Fraudulent and Unlawful Claims for "Physical Therapy" Services**

181.    In addition to their fraudulent initial examinations and follow-up examinations, the Health and Wellness Defendants almost always purported to subject the Insureds in the claims identified in Exhibit "1" to months of medically unnecessary "physical therapy" treatments, which the Health and Wellness Defendants then fraudulently and unlawfully billed to GEICO.

182.    As set forth in Exhibit "1", the Health and Wellness Defendants billed the "physical

therapy" services to GEICO under:

(i)      CPT code 97010, for purported hot/cold pack treatment, typically resulting in a charge of $46.00 for each modality they purported to provide.

(ii)     CPT code 97012, for purported mechanical traction, typically resulting in a charge of $46.00 for each modality they purported to provide.

(iii)    CPT code 97014, for purported electrical stimulation, typically resulting in a charge of $52.00 for each modality they purported to provide.

(iv)    CPT code 97032, for purported attended electrical stimulation, typically resulting in a charge of $53.00 for each modality they purported to provide.

(v)     CPT code 97035, for purported ultrasound treatment, typically resulting in a charge of $53.00 for each modality they purported to provide.

(vi)    CPT code 97110, for purported therapeutic exercises, typically resulting in a charge of $69.00 for each modality they purported to provide.

(vii)   CPT code 97112, for purported neuromuscular reeducation, typically resulting in a charge of $62.00 for each modality they purported to provide.

(viii)  CPT code 97124, for purported therapeutic massage, typically resulting in a charge of $52.00 for each modality they purported to provide.

(ix)    CPT code 97140, for purported manual therapy, typically resulting in a charge of $61.00 for each modality they purported to provide.

(x)     CPT code 97162, for purported physical therapy evaluations of moderate complexity, typically resulting in a charge of $135.00 for each examination they purported to provide.

(xi)    CPT code 97164, for purported physical therapy re-evaluations, typically resulting in a charge of $106.00 or $110.00 for each re-evaluation they purported to provide.

(xii)   CPT code 97530, for purported therapeutic activities, typically resulting in a charge of $64.00 for each modality they purported to provide.

(xiii)  CPT code 97535, for purported self-care/home management training, typically resulting in a charge of $52.00 for each modality they purported to provide.

(xiv)  Healthcare Common Procedure Coding System ("HCPCS") code E0720, for purported transcutaneous electrical nerve stimulation ("TENS") services, typically resulting in a charge of $500.00 for each unit they purported to provide.

(xv)    HCPCS code G0283, for purported electrical stimulation, typically resulting in a charge of $57.00 for each modality they purported to provide.

183.    In the claims identified in Exhibit "1", the charges for the purported "physical therapy" services were fraudulent and unlawful in that they misrepresented Health and Wellness's eligibility to collect PIP Benefits in the first instance.

184.    In fact, and as set forth herein, Health and Wellness was never eligible to collect PIP Benefits, inasmuch as Health and Wellness operated in violation of Florida law.

185.    In the claims identified in Exhibit "1", the charges for the purported "physical therapy" services also were fraudulent, unlawful, and ineligible for PIP reimbursement because the services were performed – to the extent that they were performed at all – by unlicensed and unsupervised individuals.

186.    The Health and Wellness Defendants were aware of the fact that they could not legally recover PIP Benefits for services performed by unlicensed/unsupervised individuals.

187.    As a result, and in order to conceal the fact that unlicensed/unsupervised individuals performed the purported "physical therapy" services that were unlawfully billed to GEICO through Health and Wellness, the Health and Wellness Defendants omitted any reference to the unlicensed/unsupervised individuals associated with Health and Wellness on the HCFA-1500 forms that they used to bill for the putative "physical therapy" services.

188.    Instead, in the claims for "physical therapy" services identified in Exhibit "1", the Health and Wellness Defendants routinely and falsely listed licensed health care practitioners – including Thompson – as the supposed providers or direct supervisors of the purported physical therapy services.

189.    In keeping with the fact that the "physical therapy" services in the claims identified in Exhibit "1" were unlawfully performed by unlicensed/unsupervised individuals without any

legitimate direct supervision by Thompson or any other physicians, chiropractors, physical therapists, or other licensed health care practitioners, the services were medically unnecessary and were provided – to the extent that they were provided at all – in a manner that did not comply with legitimate standards of care.

190.    In a legitimate clinical setting, each individual patient's physical therapy treatment schedule, and the specific treatment modalities that will be used as a part of that treatment, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

191.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

192.    In keeping with the fact that the purported "physical therapy" services that were billed to GEICO through Health and Wellness were not medically necessary, the Health and Wellness Defendants did not tailor the "physical therapy" services that they purported to provide to each Insured's individual circumstances and presentation.

193.    There are many individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

194.    However, the Health and Wellness Defendants purported to provide substantially similar physical therapy "treatments" to the Insureds in the claims identified in Exhibit "1" – on substantially the same schedule – without regard for the Insureds' individual circumstances.

195.    In the claims for "physical therapy" services identified in Exhibit "1", the Health and Wellness Defendants routinely and falsely represented that the "physical therapy" services were lawfully provided and reimbursable, when, in fact, the services were neither lawfully

provided nor reimbursable, because:

(i)     the purported "physical therapy" services were performed – to the extent that they were performed at all – by unlicensed/unsupervised individuals, in contravention of Florida law;

(ii)    the Health and Wellness Defendants could not lawfully recover PIP Benefits for the purported "physical therapy" services, because they were performed by unlicensed/unsupervised individuals; and

(iii)   the Health and Wellness Defendants systematically and fraudulently misrepresented and concealed the identities of the individuals who personally performed or directly supervised the putative "physical therapy" services.

**F.      The Fraudulent and Unlawful Claims for Extracorporeal Shockwave Therapy at Health and Wellness**

196.    Based on the false, boilerplate "diagnoses" that the Health and Wellness Defendants and the South Florida Rehab Defendants provided during the initial and follow-up examinations, the Health and Wellness Defendants also purported to subject many of the Insureds in the claims identified in Exhibit "1" to one or more sessions of extracorporeal shockwave therapy ("ESWT") during the course of their fraudulent treatment protocols.

197.    The Health and Wellness Defendants then billed the ESWT through Health and Wellness to GEICO under CPT code 0101T, almost always resulting in a charge of $650.00 for each ESWT treatment that the Health and Wellness Defendants purported to provide.

198.    Like the charges for the other Fraudulent Services, the charges for ESWT were fraudulent in that the ESWT was medically unnecessary and was provided – to the extent that it was provided at all – pursuant to false, boilerplate "diagnoses" that the Health and Wellness Defendants and the South Florida Rehab Defendants provided during their fraudulent examinations.

199.    In keeping with the fact that the Health and Wellness Defendants' "treatments" were medically unnecessary: (i) ESWT has not been approved by the U.S. Food and Drug

Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) Palmetto, a contractor for the Centers for Medicare and Medicaid Services ("CMS"), has published coverage guidance stating that ESWT is neither reasonable nor necessary for the treatment of musculoskeletal conditions; and (iii) there are no legitimate peer-reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

200.    Even so, the Health and Wellness Defendants purported to provide medically unnecessary ESWT to many Insureds pursuant to their pre-determined fraudulent treatment protocols, without regard for each Insured's individual complaints, symptoms, or presentation.

201.    For example:

(i)     On August 31, 2023, an Insured named LT was involved in an automobile accident. The Health and Wellness Defendants then purported to administer six different ESWT treatments to LT between March 6, 2024, and July 10, 2024. The Health and Wellness Defendants then billed GEICO for the ESWT treatments under CPT code 0101T.

(ii)    On September 19, 2023, an Insured named TM was involved in an automobile accident. The Health and Wellness Defendants then purported to administer five different ESWT treatments to TM between April 19, 2024, and May 20, 2024. The Health and Wellness Defendants then billed GEICO for the ESWT treatments under CPT code 0101T.

(iii)   On November 27, 2023, an Insured named BS was involved in an automobile accident. The Health and Wellness Defendants then purported to administer three different ESWT treatments to BS between February 22, 2024, and May 6, 2024. The Health and Wellness Defendants then billed GEICO for the ESWT treatments under CPT code 0101T.

(iv)    On December 25, 2023, an Insured named AC was involved in an automobile accident. The Health and Wellness Defendants then purported to administer seven different ESWT treatments to AC between March 26, 2024, and May 30, 2024. The Health and Wellness Defendants then billed GEICO for the ESWT treatments under CPT code 0101T.

(v)     On March 15, 2024, an Insured named NS was involved in an automobile accident. The Health and Wellness Defendants then purported to administer four different ESWT treatments to NS between May 7, 2024, and August 8, 2024. The Health and Wellness Defendants then billed GEICO for the ESWT treatments under CPT

code 0101T.

(vi)     On March 27, 2024, two Insureds named JG and PR were involved in an automobile accident. The Health and Wellness Defendants then purported to administer seven different ESWT treatments to JG between April 24, 2024, and July 15, 2024, and seven different ESWT treatments to PR between April 24, 2024, and July 3, 2024. The Health and Wellness Defendants then billed GEICO for the ESWT treatments under CPT code 0101T.

(vii)    On April 7, 2024, an Insured named AR was involved in an automobile accident. The Health and Wellness Defendants then purported to administer nine different ESWT treatments to AR between June 26, 2024, and September 6, 2024. The Health and Wellness Defendants then billed GEICO for the ESWT treatments under CPT code 0101T.

(viii)   On May 15, 2024, an Insured named FB was involved in an automobile accident. The Health and Wellness Defendants then purported to administer four different ESWT treatments to FB between July 2, 2024, and August 15, 2024. The Health and Wellness Defendants then billed GEICO for the ESWT treatments under CPT code 0101T.

(ix)     On May 25, 2024, an Insured named KM was involved in an automobile accident. The Health and Wellness Defendants then purported to administer nine different ESWT treatments to KM between June 10, 2024, and September 5, 2024. The Health and Wellness Defendants then billed GEICO for the ESWT treatments under CPT code 0101T.

(x)      On May 31, 2024, an Insured named EL was involved in an automobile accident. The Health and Wellness Defendants then purported to administer four different ESWT treatments to EL between August 8, 2024, and September 5, 2024. The Health and Wellness Defendants then billed GEICO for the ESWT treatments under CPT code 0101T.

202.    These are only representative examples. In the claims for ESWT identified in Exhibit "1", the Health and Wellness Defendants routinely billed GEICO for medically unnecessary ESWT.

## G.     The Fraudulent and Unlawful Claims for HME at Health and Wellness

203.    As part of their fraudulent and unlawful scheme, the Health and Wellness Defendants purported to provide many Insureds with HME – and particularly, a rigid lower back brace known as a lumbar orthosis ("LO").

204.     As set forth in Exhibit "1", the Health and Wellness Defendants billed GEICO for the HME under HCPCS code L0627, for purported rigid LOs with sagittal control, typically resulting in a charge of $750.00 for each unit they purported to provide.

205.     Like the Health and Wellness Defendants' charges for the other Fraudulent Services, the charges for HME were fraudulent in that they misrepresented the Health and Wellness Defendants' eligibility to collect PIP Benefits in the first instance.

206.     In fact, and as set forth herein, the Health and Wellness Defendants were never eligible to collect PIP Benefits, inasmuch as Health and Wellness operated in violation of Florida law.

207.     Moreover, the Health and Wellness Defendants' charges for the HME identified in Exhibit "1" were also fraudulent in that they misrepresented the medical necessity of the HME – and in particular, the medical necessity of rigid LOs.

208.     A rigid LO is a custom-fitted lower back brace designed to restrict the movement of a patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, a rigid LO must be custom-fitted in order for it to be properly utilized by the patient.

209.     In a legitimate clinical setting, a rigid LO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery.

210.     Because a rigid LO is designed to limit the range of motion of a patient's lumbar spine, its prescription is inconsistent with the goals of treatment designed to restore and increase range of motion and functionality of the lumbar spine.

211.     Along similar lines, the prescription and use of a rigid LO would be counterproductive to the goals of physical therapy treatment modalities, which seek to restore

movement and functionality to the lumbar spine.

212.    In fact, the medically unnecessary prescription of a rigid LO – and the resulting immobilization of the lumbar spine – may put a patient at considerable risk of weakening of the muscles or even atrophy of the muscles in the lower back.

213.    Moreover, in a legitimate clinical setting, a rigid LO should not be prescribed to a patient before the patient has first attempted and failed a legitimate course of conservative treatment, and it should not simultaneously be prescribed with conservative treatment such as physical therapy.

214.    The Insureds in the claims identified in Exhibit "1" did not suffer from spinal instability. In fact, virtually none of the Insureds in the claims identified in Exhibit "1" suffered any serious injuries at all as the result of their minor automobile accidents, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

215.    The Insureds in the claims identified in Exhibit "1" typically had not attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for a rigid LO.

216.    Even so, the Health and Wellness Defendants routinely purported to provide medically unnecessary HME to their Insureds in the claims identified in Exhibit "1", despite the fact that:

(i)     the Insureds did not suffer from spinal instability and were not recovering from spinal surgery;

(ii)    the Health and Wellness Defendants did not measure or fit the devices for the Insureds;

(iii)   the Insureds had not yet failed any legitimate course of conservative treatment, and, in fact, were often prescribed the HME within days of their typically minor automobile accidents; and

(iv)    the Insureds were often concomitantly prescribed a course of physical therapy at Health and Wellness, the supposed purpose of which was to restore the range of motion and functionality of – among other things – the Insureds' lumbar spines, and the use of a rigid LO would be counterproductive to this goal.

217.    For example:

(i)    On January 27, 2019, an Insured named DB was involved in an automobile accident. On February 12, 2019, DB presented to Health and Wellness for an initial examination. DB was immediately prescribed a course of physical therapy, which DB underwent at Health and Wellness between February 12, 2019 and July 26, 2019. Nevertheless, on the day after the initial examination, February 13, 2019, DB was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that DB: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, DB's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(ii)    On February 27, 2019, an Insured named MP was involved in an automobile accident. On March 11, 2019, MP presented to Health and Wellness for an initial examination. MP was immediately prescribed a course of physical therapy, which MP underwent at Health and Wellness between March 11, 2019 and July 29, 2019. Nevertheless, during the initial examination on March 11, 2019, MP was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that MP: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, MP's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(iii)    On September 9, 2019, an Insured named DH was involved in an automobile accident. On September 18, 2019, DH presented to Health and Wellness for an initial examination. DH was immediately prescribed a course of physical therapy, which DH underwent at Health and Wellness between September 18, 2019 and December 30, 2019. Nevertheless, on the day after the initial examination, September 19, 2019, DH was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that DH: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of

physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, DH's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(iv)     On April 6, 2020, an Insured named KC was involved in an automobile accident. On April 9, 2020, KC presented to Health and Wellness for an initial examination. KC was immediately prescribed a course of physical therapy, which KC underwent at Health and Wellness between April 9, 2020 and May 8, 2020. Nevertheless, during the initial examination on April 9, 2020, KC was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that KC: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, KC's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(v)      On July 24, 2020, an Insured named TP was involved in an automobile accident. On August 7, 2020, TP presented to Health and Wellness for an initial examination. TP was immediately prescribed a course of physical therapy, which TP underwent at Health and Wellness between August 7, 2020 and September 18, 2020. Nevertheless, during the initial examination on August 7, 2020, TP was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that TP: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, TP's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(vi)     On March 5, 2021, an Insured named RT was involved in an automobile accident. On March 10, 2021, RT presented to Health and Wellness for an initial examination. RT was immediately prescribed a course of physical therapy, which RT underwent at Health and Wellness between March 10, 2021 and May 24, 2021. Nevertheless, during the initial examination on March 10, 2021, RT was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that RT: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, RT's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(vii)  On October 4, 2021, an Insured named RR was involved in an automobile accident. On October 11, 2021, RR presented to Health and Wellness for an initial examination. RR was immediately prescribed a course of physical therapy, which RR underwent at Health and Wellness between October 11, 2021 and November 22, 2021. Nevertheless, during the initial examination on October 11, 2021, RR was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that RR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, RR's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(viii)  On December 17, 2021, an Insured named GP was involved in an automobile accident. On December 21, 2021, GP presented to Health and Wellness for an initial examination. GP was immediately prescribed a course of physical therapy, which GP underwent at Health and Wellness between December 21, 2021 and May 13, 2022. Nevertheless, during the initial examination on December 21, 2021, GP was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that GP: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, GP's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(ix)  On July 29, 2022, an Insured named ER was involved in an automobile accident. On August 2, 2022, ER presented to Health and Wellness for an initial examination. ER was immediately prescribed a course of physical therapy, which ER underwent at Health and Wellness between August 2, 2022 and August 22, 2022. Nevertheless, during the initial examination on August 2, 2022, ER was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that ER: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, ER's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(x)  On August 31, 2022, an Insured named MS was involved in an automobile accident.

65

On September 26, 2022, MS presented to Health and Wellness for an initial examination. MS was immediately prescribed a course of physical therapy, which MS underwent at Health and Wellness between September 26, 2022 and November 15, 2022. Nevertheless, during the initial examination on September 26, 2022, MS was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that MS: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, MS's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(xi)     On October 18, 2022, an Insured named YC was involved in an automobile accident. On October 27, 2022, YC presented to Health and Wellness for an initial examination. YC was immediately prescribed a course of physical therapy, which YC underwent at Health and Wellness between October 27, 2022 and December 6, 2022. Nevertheless, during the initial examination on October 27, 2022, YC was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that YC: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, YC's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(xii)    On January 13, 2023, an Insured named JE was involved in an automobile accident. On January 19, 2023, JE presented to Health and Wellness for an initial examination. JE was immediately prescribed a course of physical therapy, which JE underwent at Health and Wellness between January 19, 2023 and May 18, 2023. Nevertheless, during the initial examination on January 19, 2023, JE was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that JE: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, JE's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(xiii)   On May 6, 2023, an Insured named BJ was involved in an automobile accident. On May 15, 2023, BJ presented to Health and Wellness for an initial examination. BJ was immediately prescribed a course of physical therapy, which BJ underwent at

Health and Wellness between May 15, 2023 and August 1, 2023. Nevertheless, during the initial examination on May 15, 2023, BJ was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that BJ: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, BJ's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(xiv)   On January 17, 2024, an Insured named TR was involved in an automobile accident. On January 25, 2024, TR presented to Health and Wellness for an initial examination. TR was immediately prescribed a course of physical therapy, which TR underwent at Health and Wellness between January 25, 2024 and March 6, 2024. Nevertheless, during the initial examination on January 25, 2024, TR was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that TR: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, TR's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

(xv)   On June 12, 2024, an Insured named GB was involved in an automobile accident. On June 26, 2024, GB presented to Health and Wellness for an initial examination. GB was immediately prescribed a course of physical therapy, which GB underwent at Health and Wellness between June 26, 2024 and September 11, 2024. Nevertheless, during the initial examination on June 26, 2024, GB was also prescribed medically unnecessary HME – and, in particular, a rigid LO – despite the fact that GB: (a) did not suffer from spinal instability and was not recovering from spinal surgery; (b) was never legitimately fitted for the device; (c) had not yet failed any legitimate course of conservative treatment; and (d) was concomitantly undergoing the above-described course of physical therapy at Health and Wellness, the putative purpose of which was to increase, rather than decrease, GB's range of motion. The Health and Wellness Defendants billed GEICO under HCPCS code L0627, seeking reimbursement of $750.00 for the medically unnecessary HME.

218.   These are only representative examples. In almost all of the claims for the HME identified in Exhibit "1", the Health and Wellness Defendants falsely represented that the prescribed HME was medically necessary, when, in fact, it was not.

219.    In this context, Thompson, who – at all relevant times – purported to own Health and Wellness, did not legitimately supervise the business activities of Health and Wellness.

220.    Had Thompson legitimately supervised the business activities of Health and Wellness, he would not have permitted Health and Wellness to bill for the medically unnecessary HME that was unlawfully provided to the Insureds and then unlawfully billed to GEICO.

**H.    The Defendants' Violations of the False and Fraudulent Insurance Claims Statute**

221.    The Defendants knew that, if they made a legitimate, good-faith effort to collect PIP deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful scheme described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to Health and Wellness and South Florida Rehab for medically unnecessary treatments.

222.    Accordingly, as part and parcel of their fraudulent and unlawful scheme, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

223.    In keeping with this fact, in almost all of the thousands of bills (i.e., HCFA-1500 forms) submitted to GEICO through Health and Wellness and South Florida Rehab's Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the Insureds.

224.    In the claims identified in Exhibits "1" - "2", the Defendants routinely and falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, the services were neither lawfully provided nor reimbursable, because the Defendants operated in violation of the False and Fraudulent Insurance Claims Statute.

### III.  The Fraudulent and Unlawful Claims the Defendants Submitted to GEICO

225.  To support their fraudulent charges, the Defendants systematically submitted thousands of bills and treatment reports – containing thousands of individual charges – to GEICO through Health and Wellness and South Florida Rehab, seeking payment for Fraudulent Services that the Defendants were not entitled to receive.

226.  The claims that the Defendants submitted to GEICO were false and misleading in the following material respects:

(i)   The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with Florida law and were, therefore, eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii)   The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement, when, in fact, they were not.

(iii)   The bills and treatment reports submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all, and – to the extent that they were performed – they were not medically necessary and were performed as part of pre-determined fraudulent treatment and billing protocols designed to financially enrich the Defendants, and not to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

(iv)   The bills and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level and nature of the Fraudulent Services that purportedly were provided.

### IV.  The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

227.  The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

228.  To induce GEICO to promptly pay the fraudulent charges for the Fraudulent

Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

229.    For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

230.    The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently, never even performed in the first instance.

231.    The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by unlicensed/unsupervised individuals, and then unlawfully billed to GEICO.

232.    Moreover, the Defendants carried out their scheme through two different entities, with different tax identification numbers, in a calculated effort to reduce the amount of Fraudulent Services billed through any one entity, and thereby conceal and perpetuate their scheme.

233.    GEICO is under statutory and contractual duty to promptly and fairly process claims within thirty (30) days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to cause – and did cause – GEICO to rely on them. As a result, GEICO has incurred damages of more than $1,370,000.00.

234.    GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it commenced this action.

**FIRST CAUSE OF ACTION**
**Against Health and Wellness and South Florida Rehab**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

235.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-234, above.

236.     There is an actual case in controversy between GEICO and Health and Wellness and South Florida Rehab regarding more than $75,000.00 in fraudulent and unlawful pending billing that has been submitted to GEICO in the name of Health and Wellness and South Florida Rehab.

237.     Health and Wellness and South Florida Rehab have no right to receive payment for any pending bills submitted to GEICO because Health and Wellness and South Florida Rehab unlawfully operated in violation of Florida law.

238.     Health and Wellness and South Florida Rehab have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

239.     Health and Wellness and South Florida Rehab have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services.

240.     Health and Wellness and South Florida Rehab have no right to receive payment for any pending bills submitted to GEICO because – in many cases – the Fraudulent Services were never provided in the first instance.

241.    Health and Wellness and South Florida Rehab have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

242.    Accordingly, GEICO requests that this Court enter a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Health and Wellness and South Florida Rehab have no right to receive payment for any of the pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Thompson**
**(Violation of RICO – 18 U.S.C. § 1962(c))**

243.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-234, above.

244.    Health and Wellness is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

245.    Thompson has knowingly conducted and/or participated in, directly or indirectly, the conduct of Health and Wellness's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that Health and Wellness was not eligible to receive, because: (i) Health and Wellness unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants,

72

rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

246.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

247.    Health and Wellness's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Thompson operated Health and Wellness, inasmuch as Health and Wellness was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Health and Wellness to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Health and Wellness continues to attempt collection on the fraudulent billing submitted through Health and Wellness to the present day.

248.    Health and Wellness is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Health and Wellness in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

249.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,312,000.00 pursuant to the fraudulent bills

submitted through Health and Wellness.

250.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**THIRD CAUSE OF ACTION**
**Against Thompson, Laudadio, and South Florida Rehab**
**(Violation of RICO – 18 U.S.C. § 1962(d))**

251.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-234, above.

252.    Health and Wellness is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

253.    Thompson, Laudadio, and South Florida Rehab are employed by, or associated with, the Health and Wellness enterprise.

254.    Thompson, Laudadio, and South Florida Rehab knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Health and Wellness's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that Health and Wellness was not eligible to receive under the No-Fault Law, because: (i) Health and Wellness unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were

subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

255.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

256.    Thompson, Laudadio, and South Florida Rehab knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

257.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,312,000.00 pursuant to the fraudulent bills submitted through the Health and Wellness enterprise.

258.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**FOURTH CAUSE OF ACTION**
**Against Thompson and Health and Wellness**
**(Under Fla. Stat. §§ 501.201 et seq.)**

259.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-234, above.

260.    Thompson and Health and Wellness are actively engaged in trade and commerce

in the State of Florida.

261.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.23.

262.    Thompson and Health and Wellness engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

263.    The bills and supporting documents submitted to GEICO by Thompson and Health and Wellness in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Health and Wellness's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

264.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Thompson and Health and Wellness has been materially injurious to GEICO and its Insureds.

265.    The conduct of Thompson and Health and Wellness was the actual and proximate cause of the damages sustained by GEICO.

266.    Thompson and Health and Wellness's unfair and deceptive acts have caused GEICO to sustain damages of at least $1,312,000.00.

267.    By reason of Thompson and Health and Wellness's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against Thompson and Health and Wellness**
**(Common Law Fraud)**

268.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1-234, above.

269.     Thompson and Health and Wellness intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through Health and Wellness for the Fraudulent Services.

270.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Health and Wellness was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

271.     Thompson and Health and Wellness made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through Health and Wellness that were not reimbursable.

272.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $1,312,000.00 pursuant to the fraudulent bills that were submitted by Thompson and Health and Wellness through Health and

Wellness.

273.    Thompson and Health and Wellness's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

274.    Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**SIXTH CAUSE OF ACTION**
**Against Thompson and Health and Wellness**
**(Unjust Enrichment)**

275.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-234, above.

276.    As set forth above, Thompson and Health and Wellness have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

277.    When GEICO paid the bills and charges submitted by Thompson and Health and Wellness, it reasonably believed that it was legally obligated to make such payments based on Thompson and Health and Wellness's improper, unlawful, and unjust acts.

278.    Thompson and Health and Wellness have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Thompson and Health and Wellness voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

279.    Thompson and Health and Wellness's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

280.    By reason of the above, Thompson and Health and Wellness have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,312,000.00.

## SEVENTH CAUSE OF ACTION
### Against Thompson and Laudadio
### (Violation of RICO – 18 U.S.C. § 1962(c))

281.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-234, above.

282.    South Florida Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

283.    Thompson and Laudadio knowingly conducted and/or participated in, directly or indirectly, the conduct of South Florida Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit hundreds of fraudulent charges on a continuous basis over five years, seeking payments that South Florida Rehab was not eligible to receive, because: (i) South Florida Rehab unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly received and were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

284.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

285.     South Florida Rehab's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurance companies. The predicate acts of mail fraud are the regular way in which Thompson and Laudadio operated South Florida Rehab, inasmuch as South Florida Rehab was not engaged in a legitimate health care practice, and acts of mail fraud were, therefore, essential in order for South Florida Rehab to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that South Florida Rehab continues to attempt collection on the fraudulent billing submitted through South Florida Rehab to the present day.

286.     South Florida Rehab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by South Florida Rehab in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

287.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $58,000.00 pursuant to the fraudulent bills submitted through South Florida Rehab.

288.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

**EIGHTH CAUSE OF ACTION**
**Against Thompson, Laudadio, and Health and Wellness**
**(Violation of RICO – 18 U.S.C. § 1962(d))**

289.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-234, above.

290.     South Florida Rehab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

291.     Thompson, Laudadio, and Health and Wellness are employed by, or associated with, the South Florida Rehab enterprise.

292.     Thompson, Laudadio, and Health and Wellness have knowingly agreed, combined, and conspired to collect and/or participate in, directly or indirectly, the conduct of South Florida Rehab's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years, seeking payments that South Florida Rehab was not eligible to receive under the No-Fault Law, because: (i) South Florida Rehab unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

293.     A representative sample of the fraudulent billing and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

294.    Thompson, Laudadio, and Health and Wellness knew of, agreed to, and acted in furtherance of the common and overall objective – i.e., to defraud GEICO and other automobile insurers of money – by submitting or facilitating the submission of the fraudulent charges to GEICO.

295.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $58,000.00 pursuant to the fraudulent bills submitted through the South Florida Rehab enterprise.

296.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

### NINTH CAUSE OF ACTION
**Against Thompson, Laudadio, and South Florida Rehab**
**(Under Fla. Stat. §§ 501.201 et seq.)**

297.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-234, above.

298.    Thompson, Laudadio, and South Florida Rehab are actively engaged in trade and commerce in the State of Florida.

299.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.23.

300.    Thompson, Laudadio, and South Florida Rehab are engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

301.    The bills and supporting documents submitted to GEICO by Thompson, Laudadio, and South Florida Rehab in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) South Florida Rehab's eligibility to collect PIP Benefits in the first instance;

(ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

302.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Thompson, Laudadio, and South Florida Rehab has been materially injurious to GEICO and its Insureds.

303.    The conduct of Thompson, Laudadio, and South Florida Rehab was the actual and proximate cause of the damages sustained by GEICO.

304.    Thompson, Laudadio, and South Florida Rehab's unfair and deceptive acts have caused GEICO to sustain damages of at least $58,000.00.

305.    By reason of Thompson, Laudadio, and South Florida Rehab's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

### TENTH CAUSE OF ACTION
**Against Thompson, Laudadio, and South Florida Rehab**
**(Common Law Fraud)**

306.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-234, above.

307.    Thompson, Laudadio, and South Florida Rehab intentionally and knowingly made false and fraudulent statements of material fact to GEICO, and concealed material facts from GEICO, in the course of their submission of thousands of fraudulent bills through South Florida Rehab for the Fraudulent Services.

308.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that South Florida Rehab was in compliance with Florida law and was eligible to collect PIP Benefits in the first instance, when, in

fact, it was not in compliance with Florida law and was not eligible to collect PIP Benefits in the first instance; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and were eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, the Fraudulent Services were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, the Fraudulent Services were not actually performed.

309.    Thompson, Laudadio, and South Florida Rehab made the above-described false and fraudulent statements, and also concealed material facts, in a calculated effort to induce GEICO to pay charges submitted through South Florida Rehab that were not reimbursable.

310.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, has been injured in its business and property by reason of the above-described conduct, in that it has paid at least $58,000.00 pursuant to the fraudulent bills that were submitted by Thompson, Laudadio, and South Florida Rehab.

311.    Thompson, Laudadio, and South Florida Rehab's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

312.    Accordingly, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## ELEVENTH CAUSE OF ACTION
### Against Thompson, Laudadio, and South Florida Rehab
### (Unjust Enrichment)

313.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-234, above.

314.    As set forth above, Thompson, Laudadio, and South Florida Rehab have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of GEICO.

315.    When GEICO paid the bills and charges submitted by Thompson, Laudadio, and South Florida Rehab through South Florida Rehab, it reasonably believed that it was legally obligated to make such payments based on Thompson, Laudadio, and South Florida Rehab's improper, unlawful, and unjust acts.

316.    Thompson, Laudadio, and South Florida Rehab have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Thompson, Laudadio, and South Florida Rehab voluntarily accepted, notwithstanding their improper, unlawful, and unjust billing scheme.

317.    Thompson, Laudadio, and South Florida Rehab's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

318.    By reason of the above, Thompson, Laudadio, and South Florida Rehab have been unjustly enriched in an amount to be determined at trial, but in no event less than $58,000.00.

## JURY DEMAND

319.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Health and Wellness and South Florida Rehab, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Health and Wellness and South Florida Rehab have no right to receive payment for any pending bills submitted to GEICO.

B.      On the Second Cause of Action against Thompson, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,312,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

C.      On the Third Cause of Action against Thomson, Laudadio, and South Florida Rehab, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,312,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

D.      On the Fourth Cause of Action against Thompson and Health and Wellness, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,312,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

E.      On the Fifth Cause of Action against Thompson and Health and Wellness, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,312,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

F.      On the Sixth Cause of Action against Thompson and Health and Wellness, more than $1,312,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along

with such other and further relief as this Court deems just, proper, and equitable.

G. On the Seventh Cause of Action against Thompson and Laudadio, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $58,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

H. On the Eighth Cause of Action against Thompson, Laudadio, and Health and Wellness, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $58,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, along with such other and further relief as this Court deems just, proper, and equitable.

I. On the Ninth Cause of Action against Thompson, Laudadio, and South Florida Rehab, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $58,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

J. On the Tenth Cause of Action against Thompson, Laudadio, and South Florida Rehab, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $58,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

K. On the Eleventh Cause of Action against Thompson, Laudadio, and South Florida Rehab, more than $58,000.00 in compensatory damages in favor of GEICO, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated:  Jacksonville, Florida
        January 5, 2026

                                    */s/ Max Gershenoff*
                                    Max Gershenoff (FBN 1038855)
                                    John P. Marino (FBN 814539)
                                    Lindsey R. Trowell (FBN 678783)
                                    Kristen Wenger (FBN 92136)
                                    RIVKIN RADLER LLP
                                    926 RXR Plaza
                                    Uniondale, New York 11550
                                    Phone: (904) 792-8925

                                    -and-

                                    1301 Riverplace Blvd., 10th Floor
                                    Jacksonville, Florida 32207
                                    Phone: (516) 357-3000
                                    Max.Gershenoff@rivkin.com
                                    John.Marino@rivkin.com
                                    Lindsey.Trowell@rivkin.com
                                    Kristen.Wenger@rivkin.com

                                    *Counsel for Plaintiffs Government Employees
                                    Insurance Co., GEICO Indemnity Co., GEICO General
                                    Insurance Company, and GEICO Casualty Co.*